[No. B056146. Second Dist., Div. Five. Nov. 12, 1992.]

LOS ANGELES SMSA LIMITED PARTNERSHIP, Plaintiff and
Appellant, v.
STATE BOARD OF EQUALIZATION et al., Defendants and Appellants.

## COUNSEL

O'Melveny & Myers, Frederick A. Richman, M. Randall Oppenheimer, Marcy Jo Mandel and Scott L. Landsbaum for Plaintiff and Appellant.

De Witt W. Clinton and James L. McBride, County Counsel, Lawrence L. Matheney, Assistant County Counsel, Albert Ramseyer, Deputy County Counsel, Daniel E. Lungren, Attorney General, Timothy G. Laddish, Assistant Attorney General, Robert D. Milam and David S. Chaney, Deputy Attorneys General, E. L. Sorensen, Richard H. Ochsner and Robert W. Lambert for Defendants and Appellants.

## OPINION

**BOREN, J.**—Los Angeles SMSA Limited Partnership, a cellular telephone company doing business as PacTel Cellular (hereinafter, PacTel),[1] brought an action for a refund of 1987-1988 property taxes against the State Board of Equalization (hereinafter, the Board), which assessed PacTel's property at $250 million and against the Counties of Los Angeles, Orange, Riverside, San Bernardino and Ventura, which taxed the property based on the Board's assessment. PacTel contends that the Board's assessment should have been approximately $111.5 million because (1) the Board assessed not only PacTel's tangible property but also its Federal Communications Commission (FCC) license, its principal intangible asset, which is not subject to property taxation; (2) the Board unconstitutionally discriminated against PacTel because the FCC licenses of radio and television stations are not assessed for property tax purposes; and (3) the Board also discriminated by not assessing the FCC license of the Los Angeles Cellular Telephone Company (hereinafter, LA Cellular), PacTel's only competitor in the FCC-mandated duopoly in

---

[1]The partnership is composed exclusively of several corporations (PacTel, GTE Mobilnet, U.S. Cellular and Contel Cellular), and Pacific Telesis, through PacTel, has the controlling interest.

the greater Los Angeles area. We find that the Board's assessment properly valued PacTel, consistent with the principles discussed by the Supreme Court in *ITT World Communications, Inc.* v. *City and County of San Francisco* (1985) 37 Cal.3d 859 [210 Cal.Rptr. 226, 693 P.2d 811], by treating PacTel as a unit and a going concern, undifferentiated into separate types of assets, and that PacTel's claims of discrimination are unavailing.

## FACTUAL AND PROCEDURAL HISTORY

The Board held extensive administrative hearings and assessed PacTel's property at $250 million for 1987.[2] Although the Board's appraisal data report from its staff reflected the $250 million valuation recommendation, the report also calculated as a "total taxable earning value" a so-called "CEA" (capitalized earning ability) of between $360,041,521 (via a straight line, regular calculation) and $368,721,359 (via a modified calculation). The appraisal data report remarked, "The net operating income of this company has been increasing at a rapid rate [and was $75 million the prior year]. The Capitalized Earning Ability is the strongest indicator and is given the most weight."

As indicated by PacTel's petition to the Board for reassessment, PacTel noted that the appraisal data report did not indicate why the recommended valuation was reduced to $250 million, and assumed that the income capitalized in the CEA indicators included income generated by both the taxable property of PacTel and by its intangible FCC license. PacTel urged in its petition for reassessment that its 1987 unitary assessment should be reduced to $111,527,738, the maximum value attributed to its tangible property based upon the so-called "RCNLD" (reproduction cost new less depreciation), as computed by the Board, plus the costs (including lost earnings) which would be incurred during a hypothetical construction period to replace the property as a going concern. During the 1987 assessment year, PacTel reported an operating income of $48,012,585 and total revenues of $96,639,995.

PacTel thereafter sued for a tax refund for the 1987 assessment year seeking, inter alia, a $974,746 tax refund from the County of Los Angeles. After ensuing litigation and motions for summary judgment by both the Board and PacTel, the trial court found that PacTel's intangible property (its FCC license) was not unlawfully and unconstitutionally assessed and that the Board had not unconstitutionally discriminated in favor of PacTel's competitor. However, the trial court ruled that the matter should be remanded to the

---

[2]The assessment was subsequently reduced to $240 million by the Board after its hearings, on grounds unrelated to the FCC license issue.

Board for analysis of the reasonableness of and justification for the difference in assessment between PacTel's property and that of radio and television broadcasters regarding the assessment of their licenses.[3] Following entry of judgment, PacTel appealed and the Board and counties cross-appealed.

## DISCUSSION

### I. *The Board's purported assessment of PacTel's principal intangible property, its FCC license.*

Since PacTel is a telephone company, albeit one using cellular technology rather than conventional telephone wires, it is a public utility subject to the Board's annual assessment of taxable property and allocation of the assessment among the counties where PacTel's property is located. (Cal. Const., art. XIII, § 19; see Rev. & Tax. Code, § 721 et seq.) PacTel's principal tangible property consists of sophisticated radio and telephone equipment, computerized switching centers to facilitate communication with moving vehicles, numerous cell sites, antenna equipment and the real property interests on which its tangible property is located. PacTel alleges that its principal intangible asset is its FCC "license,"[4] only one other of which presently may be granted to any other company (here, LA Cellular) in the same cellular telephone market. A protected and apparently profitable duopoly can thus arise in each cellular telephone market.

PacTel's major contention is that the Board assessed not only PacTel's tangible property but also its most significant intangible asset, its

---

[3]We note that the remand to the Board left undecided a legal issue pending before the trial court (see Code Civ. Proc., § 170; 2 Witkin, Cal. Procedure (3d ed. 1985) Jurisdiction, § 288, pp. 694-695), and there was no unresolved issue of fact requiring remand to the Board. Accordingly, "[r]ather than treating the case as unadjudicated and remanding the matter for consideration and determination by the trial court, in the interest of judicial economy, we elect to review the case and to decide the [statutory and] constitutional questions presented." (*Atkisson* v. *Kern County Housing Authority* (1976) 59 Cal.App.3d 89, 95 [130 Cal.Rptr. 375].) Though the partial remand to the Board was unnecessary, that circumstance in this case does not preclude appellate review because of either the one final judgment rule or related notions of appealability. (See *Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 698 [63 Cal.Rptr. 724, 433 P.2d 732]; *Guntert* v. *City of Stockton* (1974) 43 Cal.App.3d 203, 209 [117 Cal.Rptr. 601].)

[4]PacTel's reference to an "FCC license" is technically inaccurate. The FCC actually issues a "Radio Station Authorization, Mobile Radio Authorization," FCC form 463 (station authorization) to permit the construction and operation of a cellular telephone system at specified "control points" and cell sites. The FCC's authorization is both in the nature of a "construction permit" required prior to commencing "construction of a station, or the installation of apparatus" (47 U.S.C. § 153(ee)) and an operational station authorization for the "use or operation of apparatus" (47 U.S.C. § 153(cc)). An FCC authorization is therefore not merely an operating license, but is more in the nature of both a construction and use permit.

FCC authorization, and that intangible personal property in the nature of a license or corporation franchise is not subject to personal property taxation by the state, pursuant to California Constitution article XIII, section 19, and Revenue and Taxation Code section 212.[5] ■ The term "franchise" is not specifically defined in the Constitution, but use of the term in the Constitution was long ago equated with "the intangible property of [a] corporation." (*People* v. *Ford Motor Co.* (1922) 188 Cal. 8, 10 [204 P. 217]; see *Miller & Lux, Inc.* v. *Richardson* (1920) 182 Cal. 115, 117, 122 [187 P. 411].) ■ The nature of the franchise in the present case is consistent with the common understanding of the term, a grant by a government agency authorizing the sale of a product or service in a prescribed geographical area. (See *California* v. *Pacific Railroad Co.* (1888) 127 U.S. 1, 40-41 [32 L.Ed. 150, 157-158, 8 S.Ct. 1073].)

■ PacTel relies upon case law predating the 1933 constitutional amendment using the phrase "except franchises" and urges that the term "franchise" means all "corporate excess," or all intangible property as determined by deducting all physical or tangible property and outstanding stocks and bonds from the total value of the company. (See *ITT World Communications, Inc.* v. *County of Santa Clara* (1980) 101 Cal.App.3d 246, 253 [162 Cal.Rptr. 186], and cases cited therein.)

The court in *ITT World Communications, Inc.* v. *County of Santa Clara, supra,* 101 Cal.App.3d 246, aptly summarized the undisputed state of the law as follows: "The state board assesses property owned or used by specified public utilities. But the corporate franchises of public utilities, excepting special franchises, are excluded from property taxation, and are subject to direct taxation under the Bank and Corporation Tax Law (Cal. Const., art. XIII, § 19; Rev. & Tax. Code, § 23154; *Roehm* v. *County of Orange* (1948) 32 Cal.2d 280, 286 [196 P.2d 550]). All other forms of intangible personal property are also exempt from property taxation. (See Cal. Const., art. XIII, § 2; Rev. & Tax. Code, § 212; *Roehm* v. *County of Orange, supra,* 32 Cal.2d at p. 285; 5 Witkin, Summary of Cal. Law (8th ed. 1974) Taxation, § 125 at pp. 4106-4107.)" (101 Cal.App.3d at p. 251, fn. omitted.)

---

[5]California Constitution article XIII, section 19, provides, in pertinent part, as follows: "The Board shall annually assess (1) pipelines, flumes, canals, ditches, and aqueducts lying within 2 or more counties and (2) property, *except franchises*, owned or used by regulated railway, telegraph, or telephone companies, car companies operating on railways in the State, and companies transmitting or selling gas or electricity. This property shall be subject to taxation to the same extent and in the same manner as other property." (As amended in 1933, italics added.)

Revenue and Taxation Code section 212 merely exempts enumerated intangibles from property tax, such as notes, debentures, shares of capital stock, bonds, solvent credits, deeds of trust and mortgages.

The crux of the problem in the present case and what PacTel fails to appreciate sufficiently is that although "intangible property is exempted from property taxation, such property may enhance the value of taxable tangible property." (101 Cal.App.3d at p. 254.) ■ "Intangible values . . . that cannot be separately taxed as property may be reflected in the valuation of taxable property. Thus, in determining the value of property, assessing authorities may take into consideration earnings derived therefrom, which may depend upon the possession of intangible rights and privileges that are not themselves regarded as a separate class of taxable property." (*Roehm* v. *County of Orange* (1948) 32 Cal.2d 280, 285 [196 P.2d 550]; see also *Michael Todd Co.* v. *County of Los Angeles* (1962) 57 Cal.2d 684, 693-694 [21 Cal.Rptr. 604, 371 P.2d 340].) "[I]ntangible values that cannot be separately taxed as property may be reflected in the valuation of taxable property . . . . [T]he propriety of including nontaxable intangible values in the valuation of otherwise taxable property has been asserted by the courts in a variety of contexts, and market value for assessment purposes is the value of property when put to beneficial or productive use." (*Western Title Guaranty Co.* v. *County of Stanislaus* (1974) 41 Cal.App.3d 733, 741 [116 Cal.Rptr. 351].)

■ PacTel emphasizes that pursuant to *Miller & Lux, Inc.* v. *Richardson, supra,* 182 Cal. 115, the term "franchise" as used in the California Constitution, article XIII, section 14 (currently art. XIII, § 19) means the so-called "corporate excess" and that the corporate excess is the value of the company above "the value of its tangible properties." (182 Cal. at p. 122.) As PacTel views the matter, the Board's assessment of value robs article XIII, section 19 of its intended effect because its assessment relied principally upon PacTel's capitalized earning ability, which PacTel assumes necessarily included both tangible and intangible assets.[6]

We reject PacTel's analysis and find sufficient support for the Board's position in the Supreme Court opinion in *ITT World Communications, Inc.* v. *City and County of San Francisco, supra,* 37 Cal.3d 859, holding that the valuation rollback provisions of article XIII A of the California Constitution (i.e., Prop. 13) do not apply to the Board's unitary valuation of state assessed

[6]"When the capitalization-of-income approach is used as a basis for an opinion of or considered in determining the market value of an operating enterprise, the result is a determination of the total value of all of the items of property which are a part of that enterprise." (*South Bay Irr. Dist.* v. *California-American Water Co.* (1976) 61 Cal.App.3d 944, 988 [133 Cal.Rptr. 166]; see *Georgia-Pacific Corp.* v. *County of Butte* (1974) 37 Cal.App.3d 461, 470 [112 Cal.Rptr. 327].) We note, however, that the Board's staff conservatively recommended only a $250 million valuation, though PacTel's capitalized earning ability was calculated at over $360 million.

public utility property. ■ As the Supreme Court explained: "One of the primary objectives of the system of unit taxation of public utility property is to ascertain and reach with the taxing power the entire real value of such property. [Citations.] It has long been recognized that 'public utility property cannot be regarded as merely land, buildings, and other assets. Rather, its value depends on the interrelation and operation of the entire utility as a unit. Many of the separate assets would be practically valueless without the rest of the system. Ten miles of telephone wire or one specially designed turbine would have a questionable value, other than as scrap, without the benefit of the rest of the system as a whole.' [Citation.] ■ Unit taxation prevents real but intangible value from escaping assessment and taxation by treating pubic utility property as a whole, *undifferentiated into separate assets* (land, buildings, vehicles, etc.) *or even separate kinds of assets* (realty or personalty)." (37 Cal.3d at p. 863, italics added.)

As the Supreme Court further emphasized: "From our review of the relevant constitutional and statutory provisions, we conclude that unit taxation is properly characterized not as the taxation of real property or personal property or even a combination of both, but rather as the taxation of property *as a going concern*. First, what the Board assesses is the value of the public utility property as a going concern; it considers the earnings of the property as a whole, and does not consider, less still assess, the value of any single real or personal asset. Second, what the Board allocates to the local taxing authority is, again, a share of the value of the public utility property as a going concern; it makes a formulary allocation based on considerations of equity, and does not even attempt to match the allocation to the fair market value of the particular assets of the utility situated within the jurisdiction." (37 Cal.3d at pp. 864-865, italics in original.)

■ PacTel protests that the Board did not, in fact, assess the unitary value or going concern value of PacTel's taxable tangible property. However, the Board did not assess any single itemized asset, whether tangible or intangible, and never specifically assessed or even addressed PacTel's FCC authorization. It is thus apparent that the 1987 $240 million assessment was simply an assessment of PacTel as a unit at its highest and best use which relied, in large part, upon a standard capitalized earning ability indicator. ■ We also note that there is no one exclusive method of valuing property and that " 'the assessor, subject to requirements of fairness and uniformity, may exercise his discretion in using one or more of them.' [Citation.]" (*ITT World Communications, Inc.* v. *County of Santa Clara, supra,* 101 Cal.App.3d at p. 252; see Cal. Code Regs., tit. 18, § 3 (assessor must "consider one or more" valuation approaches).)

■ PacTel speculates that the Board relied 60 percent upon the CEA or capitalized earning ability ($368.7 million) for $221 million and 40 percent upon the replacement cost ($73.4 million) for $29 million, thus arriving at its initial assessment of $250 million. Whatever the inspiration for the $250 million figure (later reduced to $240 million), the figure can be understood as a partial CEA value indicator reflecting an enhancement of the value of PacTel's tangible property arising from the fact that the assets were in operation as a part of a going concern with a duopolistic lock on a profitable and protected market. Accordingly, the unitary assessment of utilities is not limited to reproduction costs or RCNLD plus costs during a hypothetical construction replacement period, which would reflect PacTel's proposed reduction in valuation to $111.5 million.

It has been aptly observed that "A computation of RCNLD fails to account for the effect of factors such as obsolescence or going-concern value on the value of the property as a unit. . . . [¶] . . . [I]f the taxpayer operates in an oligopolistic market, or if its property is subject to unitary appraisal, the use of RCNLD as an upper limit on value may not be appropriate." (*ITT World Communications, Inc.* v. *County of Santa Clara, supra,* 101 Cal.App.3d at p. 256.) Nor need the Board attempt to isolate and separately value PacTel's station authorization or to deduct any amount from PacTel's unitary value. These conclusions are compelled by recognition of the fundamental concepts of unitary valuation, highest and best use and intangible enhancement.[7]

II.  *Claimed discrimination vis-à-vis FCC licensing of radio and television broadcasters.*

■ PacTel contends that even if its FCC authorization is taxable, it is entitled to a refund of property taxes because FCC licenses held by radio and television broadcasting stations were not assessed. According to PacTel, the property of public utilities (i.e., its FCC authorization) must be, in the language of article XIII, section 19 of the California Constitution, "subject to taxation to the same extent and in the same manner as other property" (i.e., FCC radio and television broadcast licenses), and the remedy for differential taxation is a reduction in the assessed value of PacTel's property and not the trial court's remand to the Board to determine if the differential was unreasonable or unjustified. However, we find that the remand to the Board was unwarranted because there is no state constitutional violation.

---

[7]We thus need not address whether PacTel's FCC authorization constitutes an assessable "special franchise" within the meaning of Revenue and Taxation Code section 23154. (See *County of Stanislaus* v. *Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1452-1456 [262 Cal.Rptr. 439]; *Cox Cable San Diego, Inc.* v. County of San Diego (1986) 185 Cal.App.3d 368, 385-388 [229 Cal.Rptr. 839].)

First, the Supreme Court in *ITT World Communications, Inc.* v. *City and County of San Francisco, supra,* 37 Cal.3d at pages 869-871, specifically held that article XIII, section 19 of the California Constitutuion does not mandate equal valuation or assessment between the Board and counties,[8] only equal tax rates. The Supreme Court rejected a discrimination claim analogous to that raised by PacTel. The court found that the intent of the electorate in 1933 regarding article XIII, section 19 was to establish that unit assessments of public utility properties are to be processed and collected by local tax officials in the same way as locally assessed property, after the unit value was established. (37 Cal.3d at pp. 869-871.) Radio and television broadcasters are not public utilities, unlike telephone companies, and are therefore not necessarily subject to the type of unit assessment authorized by article XIII, section 19 for public utility property. (37 Cal.3d at p. 871.) Such a distinction is consistent with the absence of any "iron rule of equality" regarding schemes of state taxation. (*Allied Stores of Ohio* v. *Bowers* (1959) 358 U.S. 522, 526 [3 L.Ed.2d 480, 484, 79 S.Ct. 437].) The distinction between broadcasters and public utilities is also consistent with the broad discretion granted states in classifying property for tax purposes and imposing different taxes upon different trades and services. (*Id.* at pp. 526-528 [3 L.Ed.2d at pp. 484-486].)

Moreover, PacTel stipulated that the property of radio and television broadcasters was assessed at fair market value and that their equipment was assessed at its highest and best use, even though station licenses, among other government authorizations, are necessary to permit such use. PacTel also does not contend that the property of radio and television broadcasters was undervalued or systematically underassessed. Accordingly, the broadcasters' properties were properly assessed by the counties at "fair market value," just as the Board properly calculated PacTel's cellular telephone system in 1987 at "fair market value." Therefore, since all entities were assessed at "fair market value," no constitutional discrimination could ensue even if different appraisal approaches were used. (See *Wild Goose C. Club* v. County of Butte (1922) 60 Cal.App. 339, 343 [212 P. 711].)

III. *Alleged discriminatory and unconstitutional assessment vis-à-vis assessment of PacTel's competitor, LA Cellular.*

Finally, PacTel contends that the Board's assessment for 1987 was invalid because the Board assessed PacTel's FCC authorization but not that of its direct competitor, LA Cellular. PacTel thus urges that the Board

---

[8]The Board only assesses public utilities and pipelines. Since broadcasters do not fall in either of those two categories, they are locally assessed by the counties in which they are located.

violated state and federal guaranties of equal protection and uniformity of treatment. (See U.S. Const. Amend. XIV, § 1; Cal. Const. art. I, § 7, art. IV, § 16, subd. (a), art. XIII, § 1, subd. (a).)

"Taxation must, of course, be uniform and the tax laws uniformly applied." (*Crocker National Bank* v. *City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) Nonetheless, in the case of equal protection challenges to state taxation, " ' "[w]here . . . no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation." ' " (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 233-234 [149 Cal.Rptr. 239, 583 P.2d 1281].) As long as a tax system has a "rational basis" and is not "palpably arbitrary," it will be upheld despite the absence of precise, scientific uniformity of taxation. (*Id.* at p. 234.) The fact that "two taxpayers may pay different taxes on substantially identical property is not wholly novel to our general taxation scheme." (*Id.* at pp. 235-236.) To establish a violation of equal protection, a taxpayer must show the "intentional, systematic undervaluation of property similarly situated with other property assessed at its full value . . . . [Citations.]" (*Id.* at p. 234, italics omitted; see *R.H. Macy & Co.* v. *Contra Costa County* (1990) 226 Cal.App.3d 352, 366 [276 Cal.Rptr. 530].)

PacTel's claimed denial of equal protection is unavailing for several reasons. First, contrary to PacTel's characterization of the facts, in 1987 LA Cellular did not petition the Board based on a specific complaint "that the Board had improperly included the amount paid to MCI to secure the FCC license in using the cost approach to value LA Cellular's property." To the contrary, LA Cellular's 1987 petition for reassessment urged that the objected-to costs were for "settlement of a lawsuit" and should be excluded from valuation as they were "in the nature of punitive damages and should not be part of the value." Contrary to PacTel's representation, the purchase and sale agreement of a customer base between MCI and LA Cellular thus did not indicate that the costs referred to by PacTel were to secure the FCC authorization.

Second, the Board's method of assessment did not result in an improper disparity. In 1987, the Board relied primarily upon historical and reproduction cost indicators to determine value for LA Cellular, but relied primarily upon a CEA indicator to determine value for PacTel. In 1988 and thereafter, the Board used a CEA value indicator to determine the unitary value of the cellular telephone systems of both PacTel and LA Cellular. However, the use

of a cost approach to value, relying upon historical and reproduction cost indicators, rather than a capitalized income indicator, only for LA cellular in 1987 was warranted since LA Cellular had a loss in the 1986 tax year. The Board thus had no historical net income to capitalize for the January 1, 1987, lien date assessment. Also, on that lien date, LA Cellular was not even fully operational. Accordingly, any disparity in treatment between LA Cellular and PacTel for the 1986 tax year constituted an appropriate, isolated and temporary transitional delay in adjustment which did not run afoul of any equal protection or uniformity of treatment concerns. (See *Allegheny Pittsburgh Coal* v. *Webster County* (1989) 488 U.S. 336, 344 [102 L.Ed.2d 688, 697-698, 109 S.Ct. 633]; *Sunday Lake Iron Co.* v. *Wakefield* (1918) 247 U.S. 350, 353 [62 L.Ed. 1154, 1156, 38 S.Ct. 495].)

### DISPOSITION

The trial court's order remanding to the Board the second and fifth causes of action, for a statement of the Board's reasons regarding the claimed inequity of treatment as to the FCC licenses of PacTel versus radio and television broadcasters, is vacated. The trial court is directed to enter judgment in favor of the Board and the county defendants as to the second and fifth causes of action. As to the remaining causes of action, the judgment in favor of the Board and the county defendants is affirmed. PacTel is to pay all costs on appeal.

Turner, P. J., and Jackson, J.,* concurred.

---

*Judge of the Municipal Court for the Antelope Judicial District sitting under assignment by the Chairperson of the Judicial Council.