(919 P.2d 1048)

No. 74,324

In the Matter of the Appeal of WESTERN RESOURCES, INC., From a Decision of the Director of Property Valuation.

Opinion filed July 12, 1996.

*Galen E. Biery*, of Western Resources, Inc., of Topeka, and *S. Lucky DeFries* and *Jeffrey A. Wietharn*, of Coffman, DeFries & Nothern, of Topeka, for the appellant.

*William E. Waters*, of Division of Property Valuation, of Kansas Department of Revenue, for the appellee.

Before KNUDSON, P.J., LEWIS, J., and JACK L. BURR, District Judge, assigned.

LEWIS, J.: In 1991, Western Resources, Inc., (WRI) began to upgrade and change its computer system. In the process, it obtained a license for application software. The process cost WRI approximately $15 million. WRI contends that its application software is intangible personal property and not taxable. It believes that the Property Valuation Division (PVD) of the Kansas Depart-

ment of Revenue included the value of its application software in the unit value of WRI.

WRI demanded that the PVD deduct the appraised value of the application software from the total unit value determined. The PVD refused to do so. WRI then appealed to the Board of Tax Appeals (BOTA) seeking relief. BOTA held that application software was taxable as part of the unit value. This appeal followed.

This is a complex and potentially far-reaching case. Our task is not aided by the fact that no one seems to have any idea to what extent, if any, the taxable value of WRI's property was affected by the inclusion of the application software. Counsel for WRI, on numerous occasions during oral argument before this court, could not advise the court how its total tax bill had been affected by the inclusion of application software in the unit value. The representatives of the PVD were no more helpful. Counsel for the PVD did concede that the unit value of WRI was affected at least to some degree by the application software. However, he insisted that he had absolutely no idea how much. The PVD adamantly insists that it cannot determine what percentage of the total unit value is attributable to the inclusion of the application software into the mix. The net result is that we are unable, on the record before us, to determine what relief, if any, WRI is entitled to, assuming its arguments are valid. This requires, as will later become apparent, that this matter be remanded for further hearings.

The least complex issue presented is determining the nature of the application software. Both parties agree that it is intangible property by virtue of the decision in *In re Tax Protest of Strayer*, 239 Kan. 136, 716 P.2d 588 (1986). In *Strayer*, BOTA had determined that computer software was taxable as tangible personal property. The Supreme Court reversed, at least partially, and held: "Application programs, those which are particularized instructions adopted for special programs, are intangible property not subject to the personal property tax for tangible property." 239 Kan. 136, Syl. ¶ 3. The court went on to hold that operation programs, without which a computer cannot operate, were tangible property and were subject to the personal property tax on tangible personal property. 239 Kan. at 143.

There appears to be no question in this case that we are dealing with application software which, by the definition developed in *Strayer*, is an intangible. This, unfortunately, appears to be virtually the only issue on which the parties can agree.

WRI argues that *Strayer* controls. It suggests that the only way its application software could be taxed is as tangible personal property and that this cannot be done under *Strayer*. This argument is premised on the supposition that intangibles are not taxed by K.S.A. 79-101.

A necessary implication of *Strayer* is that intangibles are not, in fact, taxable under K.S.A. 79-101. That statute provides: "All property in this state, real and personal, not expressly exempt therefrom, shall be subject to taxation in the manner prescribed by this act." K.S.A. 79-102 defines "personal property" as used in the act as "every tangible thing which is the subject of ownership." The Supreme Court in *Strayer* concluded that the definition of personal property as "every tangible thing" indicates that intangibles are not included in the term personal property and that, as a result, they were not taxable under K.S.A. 79-101. We accept the conclusion of *Strayer* in this regard and agree that decision precludes the taxing of intangibles under K.S.A. 79-101.

However, as the PVD points out, this does not answer the question raised in this case. The PVD points out that it does not premise its taxation of WRI's application software under K.S.A. 79-101. It argues that at least indirect taxation of intangibles is authorized by K.S.A. 79-5a04. This statute applies only the valuation of property owned by a "public utility" and provides in pertinent part:

"The director of property valuation shall annually determine the fair market value of public utility property, both *real and personal, tangible and intangible*, of every public utility as defined in subsection (a) of K.S.A. 79-5a01 and amendments thereto.

"As used in this section, 'fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. For the purposes of this definition, it shall be assumed that consummation of a sale occurs as of January 1.

"The division of property valuation in determining the fair market value of public utility property shall, where practicable, determine the unit valuation, allocated to Kansas, and in doing so shall use generally accepted appraisal procedures developed through the appraisal process and may consider, including but not by way of exclusion, the following factors: . . . ." (Emphasis added.)

The PVD argues that whereas intangibles may not be taxable under K.S.A. 79-101, they are at least includable under the unit system as provided for by K.S.A. 79-5a04.

WRI counters by arguing that all K.S.A. 79-5a04 does is to allow the PVD to determine the fair market value of all of the real, personal, tangible, and intangible property of a public utility. It argues that the statute does not permit the taxation of the property, nor does it impose a tax on the property described. As WRI views the statute, K.S.A. 79-101 *imposes* a tax on real estate and tangible personal property. It argues that there is no statute which *imposes* a tax upon its intangible application software and, as a result, that particular property is not taxable in this state. It then posits that if application software is not taxable, it must be removed from the unit value of WRI before any tax can be levied.

There is merit in the approach taken by WRI. K.S.A. 79-5a04 states in its preamble that it deals with the *valuation* of public utility real and personal property. The statute does not appear to specifically subject anything to taxation. It only requires the director of property valuation to "annually determine the fair market value" of public utility property.

Despite what is said or not said in K.S.A. 79-5a04, we think that a reasonable construction of this statute is that it does, at the very least, authorize the inclusion of certain intangibles within the unit value. We reach this conclusion by reading 79-5a04 in the context of the entirety of chapter 79, article 5a, which deals with the taxation of public utilities:

" 'In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof *in pari materia. When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law.'* " *Todd v. Kelly,* 251 Kan. 512, 516, 837 P.2d

381 (1992) (quoting *Kansas Commission on Civil Rights v. Howard*, 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 [1975]).

See *State v. Gonzales*, 255 Kan. 243, 249, 874 P.2d 612 (1994); *Bradley v. Board of Butler County Comm'rs*, 20 Kan. App. 2d 602, Syl. ¶ 4, 890 P.2d 1228 (1995).

We think it is very obvious that article 5a of chapter 79 is designed not only to value but to effectuate the taxation of property of a public utility. If this were not so, then much of article 5a of chapter 79 is totally superfluous. K.S.A. 79-5a04 requires the Director of the PVD to value the property at its fair market value. K.S.A. 79-5a25 through 5a28 deals with apportioning the assessed value to the various taxing districts. In the final analysis, the various taxing districts are to use the assessed valuation in preparation of their budgets for *ad valorem tax purposes*.

It is inescapable to us that taken as a whole, article 5a of chapter 79 was intended by the legislature to provide the method for taxing the taxable assets of public utilities. In order to accomplish the intention of the legislature, we must construe 79-5a04 as imposing or authorizing a tax on the unit value of a public utility. We reject the argument of WRI that there is no statute which imposes a tax on its property. We conclude that when construed in the light of the purpose of the entire article, 79-5a04 does authorize the valuation and taxation of the public utility property described therein through the unit value method.

The next question is one which we do not feel constrained to reach on the record before us. WRI argues that the 1985 and 1992 amendments to article 11, § 1 of the Kansas Constitution do not authorize the taxation of its application software. Since we deal here with the years 1992 and before, the 1992 amendment is not applicable. However, there is nothing in that amendment which would change the outcome of the question presented.

Article 11, § 1(b) of the Kansas Constitution, as amended in 1985, reads as follows:

"(1) The provisions of this subsection (b) shall govern the assessment and taxation of property on and after January 1, 1989, and each year thereafter. Except as otherwise hereinafter specifically provided, the legislature shall provide for a uniform and equal basis of valuation and rate of taxation of all property subject

to taxation. The provisions of this subsection (b) shall not be applicable to the taxation of motor vehicles, except as otherwise hereinafter specifically provided, *mineral products, money, mortgages, notes and other evidence of debt and grain.* Property shall be classified into the following classes for the purpose of assessment and assessed at the percentage of value prescribed therefor:

"Class 1 shall consist of real property. Real property shall be further classified into four subclasses. Such property shall be defined by law for the purpose of subclassification and assessed uniformly as to subclass at the following percentages of value:

. . . .

*"Class 2 shall consist of tangible personal property. Such tangible personal property shall be further classified into six subclasses, shall be defined by law for the purpose of subclassification and assessed uniformly as to subclass at the following percentages of value:*

. . . .

(C) *Public utility tangible personal property* . 30%

. . . .

(F) *All other tangible personal property not otherwise specifically classified* 30%

"(2) All property used exclusively for state, county, municipal, literary, educational, scientific, religious, benevolent and charitable purposes, farm machinery and equipment, merchant's and manufacturer's inventories and livestock and all household goods and personal effects not used for the production of income, shall be exempted from property taxation." (Emphasis added.)

WRI argues that by limiting taxable property to real property and tangible personal property, the constitution has, by definition, excluded certain intangibles as taxable property in this state. This is an argument with a considerable amount of merit and logic. It is also a question we see no need to answer at this point.

It is clear that certain properties which we would define as intangibles are excepted from the scope of article 11, § 1(b). It is specifically provided that, among other things, "mineral products, money, mortgages, notes and other evidence of debt and grain" are excepted from the scope of this provision of the Kansas Constitution. It is worthy to note that nowhere in article 11, § 1 is the term "intangible" used. Despite that fact, there is no question that the property listed above is considered intangible and is excepted from the provisions of article 11, § 1 of the Kansas Constitution. In this case, we deal with application software. It is not a mineral product, it is not money, it is not a mortgage, it is not a note, it is

not other evidence of debt, and it is not grain. Neither, according to the Kansas Supreme Court in *Strayer*, is it tangible personal property. The real question is whether an intangible such as application software is subject to taxation in light of the provisions of article 11, § 1 of the Kansas Constitution.

To answer the question posed would require us to consider the constitutionality of not only K.S.A. 79-5a04 but also K.S.A. 79-101 and all other statutes which might be construed as imposing a property tax on any intangibles not specifically excepted from the provisions of article 11, § 1.

We do not believe the record in the case before us requires us to consider the constitutional issues raised. We are unable to tell from the record to what extent the application software in this case affected WRI's tax bill in the years in question. Indeed, we are unable to say with absolute certainty that the value of the application software is even included in the total unit value of WRI as computed. We decline to deal with constitutional issues in a vacuum. If we were to conclude that WRI is correct in its constitutional argument, we would be unable to determine whether our decision would entitle it to significant, de minimis, or any relief whatsoever. For that reason, we are remanding this case for further proceedings.

The problem lies, at least partially, in the nature of the unit system. The other complication is the "smoke and mirrors" approach of the PVD. We refuse to believe it is unable to determine the extent to which the inclusion of application software in the unit affected the total valuation. If it truly does not know and cannot determine this fact, then it is possible that the unit system is nothing more than an elaborate fiction designed to conceal the true nature of how the assessed valuation of a public utility is determined.

In its purest sense, the unit system taxes only the total value of a business as a going concern. It does not tax, nor does it necessarily include, the fair market value of all of the component parts. See, e.g., *Adams Express Company v. Ohio*, 166 U.S. 185, 41 L. Ed. 965, 17 S. Ct. 604 (1897); *Mich., Wis. Pipe Line v. Iowa State Bd. of Rev.*, 368 N.W. 2d 187 (Iowa 1985). Indeed, the unit value of a

going business might be more or less than the fair market value of the tangible, real, and intangible property which make up the assets of the business. Robert M. Badenoch, the expert who testified for the PVD, was asked to tell BOTA what PVD exhibit 5 purported to show. In answering that question, he explained the unit system as follows:

"A. Well, it proports [*sic*] to depict a lot, at least in my opinion. Start out with—in contrast to the methodology valuations that we saw in the commercial, industrial, and residential we are talking in utility terms about a value called the unit value.

"Which means you value the total property in its operation as a going concern. You're not looking for the individual building asset value, you're looking for a value of the operation business value of the entity, so the end result is different. Although they are both market value, you're not looking for the value of any asset, any particular asset when one does a unit value. The unit conditions as it would encompass of anything real personal and intangible values incorporated that make the business run.

"Typically we value all property that is owned, used, or operated to make the public, to make the utilities function. In the real it's land and buildings. In the personal that represents functionally; poles, wires, tract, airplanes, desk, chairs, pencils, computers, system software to run them. Which I don't believe there is any dispute about that.

"It also includes all intangibles be they booked or be they unbooked. Intangibles cover a wide variety of things; franchise fees, license, patents, goodwill, brand recognition, going concern, functional plant layout, how it's constructed, area demographics, what are the claims, how many of them, how dense are they. Could even include such things as; favorable department, or favorable leasing, the customer base assembly to work force of their own staff, how much education do they have, how good are they at their jobs, this kind of thing. Inventory of advertisement materials—it sounds strange, but the slogo and jingles and trademarks are all intangibles, which go to aide the company in generating a dollar. It also includes the primary focus of this hearing which is the custom software or in-house developed software.

"As I understand this, it was in part purchased over the shelf and in part adapted for specific needs of the gas company. But in looking for that unit value it also, the interaction of all of these pieces the real, the personal, and the intangible that keep rotating around and make a mix and kick out a dollar. And that dollar functionally is the value of the company and that is what we're seeing.

"And this dollar which has then no representation of any particular asset within the company, it is used as the market value of the company, and generally speaking placed because of the statutes requiring our distribution. Let me just state that those other two properties that we talked about or all of those systems in real

estate and commercial industrial have a unique status they have one taxing unit usually. A property of this nature has many taxing units.

"For instance the gas company in this case has a thousand sixty-two units, taxing units, in which they have property. So we must take this dollar and distribute it somehow against all of that property in a hundred sixty-two taxing units.

"The methodology by which that is done has been given to us by the legislature and they've told us to do it by via original cost. So this dollar amount is rationed against the original cost for everyone, original cost dollar, then gets a proportionate share of the market value.

"And those original cost dollars are known for each taxing unit, which of the each hundred sixty-two or thousand sixty-two taxing units has an original cost dollar, that's allocated by the company, either on a unit basis or on a particular status basis depending a lot on how they keep their books.

"Q. Mr. Badenoch, do you—referring to what has been marked for identification as PVD Exhibit 5, inside the circle there, do you value any one of those items—

"A. No.

"Q. —and include the valuing of any one of those items in the unit value?

"A. We include the value of all of these items in the correlated unit value. We do not know the value of any particular item within the unit value. It loses its identity through this mix. We don't—intangibles have no value, without real and personal property they're worthless. You get a license you can't do anything with it unless you add personal or real.

"If you have personal and real property you can't do anything with it in a public utilities sense unless you get the license—the franchise. So they are inseparateable [*sic*], you can't use one without the other, they become scrap value in either case. And scrapped to have the property without the franchise and if you get the franchise and don't have the property you still got nothing."

WRI produced no testimony which seriously disputes the testimony of Badenoch.

Unit value has been characterized, not as the valuation of real property or personal property or even a combination of both, but rather as a valuation of property as a going concern. *ITT World Communications, Inc. v. City and County of San Francisco*, 37 Cal. 3d 859, 864, 210 Cal. Rptr. 226, 693 P.2d 811 (1985). Under this theory, the value of tangible property is *enhanced* not by the taxation of intangibles but by including intangibles in the valuation as a whole. See *Norfolk & W. R. Co. v. Tax Comm'n*, 390 U.S. 317, 324, 19 L. Ed. 2d 1201, 88 S. Ct. 995 (1968); Amdur, *Property Taxation of Regulated Industries*, 40 Tax Lawyer 339, 346 (1986).

The PVD asserts that it has utilized the "enhanced value" theory and that under that theory only tangible value results. This argument has merit if accurate.

By utilizing the unit value, states have been allowed to consider properties as part of the unit value which they could not tax directly. For instance, in *Pullman Co. v. Richardson*, 261 U.S. 330, 338, 67 L. Ed. 2d 682, 43 S. Ct. 366 (1923), the State of California had included in its unit value Pullman cars which were not located in that state. The argument was made that the State could neither tax the act of engaging in interstate commerce nor lay a tax on the gross receipts therefrom. The United States Supreme Court held that under the unit theory concept, California could include property which "enhanced" the value of the unit which it could not tax directly:

"A State within whose limits such property is permanently located or commonly used may tax it. [Citations omitted.] *And, if the property be part of a system and have an augmented value by reason of a connected operation of the whole, it may be taxed according to its value as part of the system, although the other parts be outside the State;—in other words, the tax may be made to cover the enhanced value which comes to the property in the State through its organic relation to the system.* [Citations omitted.]" (Emphasis added.) 261 U.S. at 338.

See *Norfolk & W. R. Co. v. Tax Comm'n*, 390 U.S. 317; *Branson v. Bush*, 251 U.S. 182, 64 L. Ed. 215, 40 S. Ct. 113 (1919); *Cleveland &c. Railway Co. v. Backus*, 154 U.S. 439, 38 L. Ed. 1041, 14 S. Ct. 1122 (1894); *Los Angeles SMSA Ltd. Partnership v. State Bd. of Equalization*, 11 Cal. App. 4th 768, 776, 14 Cal. Rptr. 2d 522 (1992); *ITT World Communications, Inc. v. County of Santa Clara*, 101 Cal. App. 3d 246, 254, 162 Cal. Rptr. 186 (1980); *Roehm v. County of Orange*, 32 Cal. 2d 280, 285, 196 P.2d 550 (1948).

A review of the various authorities cited above leaves no doubt as to the validity of the unit value method in valuing and taxing the property of a public utility. We conclude that under that method, intangible property, exempt or nontaxable, may be used to the extent that it creates an "enhanced" value of tangible property. In that manner, it is not the intangible that is being taxed but the enhanced value of the tangible property.

As employed in that context, it may be irrelevant as to whether the application software in this case was taxable in and of itself.

If, on the other hand, it develops that the entire value of the application software was included in reaching the unit value, then a question exists as to whether it is constitutional to tax the application software. We deal in this instance with the difference between the theory of "enhanced valuation" and the outright taxation of the intangible itself. It is possible that under our constitution the outright taxation of the intangible itself is not permitted. The record in this case is insufficient to enable us to determine which scenario we deal with.

The question we need to have resolved was illustrated by the case of *GTE Sprint Communications Corp. v. County of Alameda*, 26 Cal. App. 4th 992, 32 Cal. Rptr. 2d 882 (1994). In that case, the tax authorities apparently included the entire value on the intangible assets in calculating the unit value of Sprint's California property. There apparently was no effort made to explain whether the "enhanced valuation" concept was employed. The California court described the tax board's action as "myopic" and indicated it felt the Board was only paying "lip service" to the concept of unit method valuation. The tax board in California, as does the PVD in this case, apparently refused to explain how it had dealt with exempt tangibles in reaching the unit value. The California court concluded:

"While we recognize that intangible assets may contribute enhancement value to the tangible property of the going concern, we cannot conclude, as the Board does, that the entire value of the intangible assets identified by Sprint may be subsumed, as a matter of law, in the unit value of Sprint's California property.

"Accordingly, it is necessary to return this matter to the Board for a reassessment hearing as to both tax years, at which time the Board's appraisers shall have an opportunity to present evidence rebutting Sprint's identification and/or valuation of intangible assets. At that hearing, both parties may present evidence as to the portion of the intangible values, if any, that can be deemed to enhance the value of the tangible property." 26 Cal. App. 4th at 1008.

On this appeal, we remand for similar reasons. If, on remand, it can be determined that the application software in this case is part of the unit value only to the extent that it "enhances" the value of

other tangible property, then no constitutional issue would be presented and we would affirm the inclusion of the application software to that extent. If, on the other hand, the PVD has simply added the full value of the application software to the value of other taxable assets of WRI, then the intangible itself is being taxed, and whether it can be taxed under article 11, § 1 of the Kansas Constitution is an issue which must then be resolved.

The resolution of the questions remanded may be complex; it does not make the task impossible. We think that WRI, as any other taxpayer, is entitled to an explanation of the extent to which its taxes are based on the value of the application software in question. It is not acceptable for the PVD to simply state it cannot answer that question. The PVD compiles the unit value of the public utility, and for that division to say it does not know how it reached the total valuation for tax purposes indicates to us that it is either stonewalling or frighteningly incompetent. It is the job of the PVD to know what it is doing, and it has a duty to advise the taxpayer of the manner in which it taxes their property.

We are prepared to hold that the failure of the PVD to identify how it dealt with WRI's application software would be an admission that it employs the unit method only as a fiction and that the entire value of WRI's application software has been included and taxed in the total value of the unit.

We reverse the decision of BOTA and remand for a determination of the issues indicated in this opinion. Once those issues are resolved, we will be in a position to determine whether the constitutional issues raised are relevant and, if so, to resolve those issues.

Reversed and remanded.