No. 89,494

In the Matter of the Appeal of COLORADO INTERSTATE GAS COMPANY from a Decision of the Director of Property Valuation of the State of Kansas.

(79 P.3d 770)

Opinion filed November 7, 2003.

*Richard D. Greene,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Karen L. Pauley,* of El Paso Corporation, of Houston, Texas, was with him on the briefs for appellant.

*William E. Waters,* of the Kansas Department of Revenue, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: This matter comes before this court for the second time following the Board of Tax Appeals' (BOTA) valuation of Colorado Interstate Gas Company's (CIG) property in Kansas for ad valorem taxation purposes. In the first appeal, *In re Tax Appeal of Colorado Interstate Gas Co.*, 270 Kan. 303, 14 P.3d 1099 (2000), this court reversed the BOTA final decision primarily based upon BOTA's application of an erroneous standard of review. Upon remand, the matter was again submitted to BOTA upon the existing record.

CIG appeals, claiming that BOTA ignored this court's decision in *Colorado Interstate Gas* again by applying an incorrect standard of review. CIG also raises the following three issues: (1) BOTA failed to honor this court's mandate to embrace an allocation methodology that achieves fair market value, (2) BOTA erred when it taxed CIG's intangible property, and (3) the 1992 amendment to article 11, § 1 of the Kansas Constitution, which denies public utilities an exemption from taxation of their inventories, violates CIG's equal protection rights under the United States Constitution

Facts

There is little agreement between the parties as to the material facts of this case. In its decision upon remand, BOTA sets forth a statement of facts consisting of 42 paragraphs. CIG's statement of facts consists of 10 separate paragraphs in its initial brief, with support to the record. The Department of Revenue Property Valuation Division (PVD) lists 34 separate paragraphs of facts, also with support in the record. In its reply brief, CIG, in 10 separate

paragraphs, again with support in the record, argues that the PVD's facts distort the record. Both parties use facts favorable to their respective positions to argue the case before this court. A far better approach, perhaps unattainable in light of the voluminous record and the disparate position of the parties, would have been a stipulation as to the material facts. Since we are called upon to review the BOTA decision in this case, we begin with BOTA's statement of facts, leaving the factual arguments of the parties to the analysis portion of this opinion.

The BOTA order on remand sets forth the following factual findings:

"3. On remand, the parties have agreed that additional evidence is not necessary and that the Board should review the evidence previously presented and issue a decision utilizing the standards set forth by the Supreme Court. The following issues are before the Board:

"A. The appropriate unit valuation of the Taxpayer's property for 1993, 1994 and 1995 tax years, including

"a. The Appropriate Capitalization Rate.

"i. Appropriate Cost of Equity.

"b. Inclusion of Non-taxable Intangibles in the Unit Valuation.

"B. The allocation of that unit valuation to Kansas, including which of the following allocation methodologies should be used:

"a. Original cost.

"b. Rate base.

"c. Net book cost.

"d. Blend of rate base and net book cost.

"4. At the January 1997 hearing of these matters the following individuals testified:

"Called as witnesses by the Taxpayer:

"Richard G. Smead Senior Vice-President, Colorado Interstate Gas Co.

"Dan A. Homec Ass't. Vice-President and Controller, Colorado Interstate Gas Co.

"Kenneth Williams Vice-Chairman, Brown, Williams, Scarbrough & Quinn, Inc., Consulting

"Prof. J. Peter Williamson The Laurence F. Whittemor Professor of Finance, Amos Tuck School of Business, Dartmouth College

"Dr. John H. Davis, III PhD, MAI, SRPA, ASA, Business Valuation Services, Inc.

"Robert M. Badenoch Bureau Chief, State Appraised Properties, Division of Property Valuation, Kansas Dept. of Revenue

"John Hughes Tax Examiner 4, Division of Property Valuation, Kansas Dept of Revenue

"Floyd Rumsey Supervisor, Utility Section, State Appraised Properties, Division of Property Valuation, Kansas Dept. of Revenue

"Called as witnesses by the Division of Property Valuation:

"Michael W. Goodwin CAE, ASA, Michael W. Goodwin & Associates

"Dr. A. James Ifflander PhD, CFA, Private Consultant

"Robert M. Badenoch Bureau Chief, State Appraised Properties, Division of Property Valuation, Kansas Dept. of Revenue

"John Hughes Tax Examiner 4, Division of Property Valuation, Kansas Dept. of Revenue

"Floyd Rumsey Supervisor, Utility Section, State Appraised Properties, Division of Property Valuation, Kansas Dept of Revenue

"5. The Taxpayer has also raised a number of constitutional issues. The Board does not have the authority to determine whether these arguments have merit. The Board is to presume that the Kansas Constitution does not violate the federal constitution and that the Kansas statutes do not violate the U.S. Constitution or Kansas Constitution. The Board has no authority to determine constitutional questions. *Zarda v. State*, 250 Kan. 364, 826 P.2d 1365, *cert. denied*, 504 U.S. 973, 119 L. Ed 2d 566, 112 S. Ct. 2941 (1992). Therefore, the Taxpayer's constitutional arguments will not be addressed.

"6. The allocation of unit valuation to Kansas is the primary issue before the Board. The Taxpayer does not take issue with the method used by PVD to apportion the allocated unit value to the respective taxing jurisdictions within the State of Kansas.

## "FINDINGS OF FACT

### "General Findings

"7. The Taxpayer is a natural gas company providing production, gathering, processing, storage, transportation, and sales of natural gas from the Montana-Wyoming border through Utah, Colorado, Kansas, Oklahoma, and into Texas. The Taxpayer has tangible property located in seven different states in the Rocky Mountain region and its vicinity.

"8. The Taxpayer is regulated by the Federal Energy Regulatory Commission ('FERC') which exercises preemptive jurisdiction over nearly all of Taxpayer's interstate natural gas transmission, storage and gathering business activities. However, production, merchant, processing, and gathering functions are essentially unregulated.

"9. FERC regulates the Taxpayer's rates by establishing through adversary proceedings (rate cases) the amount Taxpayer is allowed to charge for each unit of service.

"10. As defined by FERC, 'rate base' is the original cost of assets minus depreciation and deferred federal income taxes (DFIT).

"11. Effective October 1, 1993, FERC Order 636 changed the business environment for the Taxpayer by unbundling the several functional operations of the Taxpayer and providing for increased competition.

. . . .

"Intangibles

"26. Intangible property was included in the Taxpayer's unit value only to the extent that it enhanced the unit value of the Taxpayer's property. No specific amount of the unit valuation can be directly attributed to intangible components of the unit. As required by K.S.A. 79-3109c, money, mortgages, and other evidence of debt were not included in the unit valuation of the Taxpayer's property.

"27. Interest and overhead are not intangible assets, but are a capitalized part of the operating property of the Taxpayer. Ifflander, Transcript, pp. 859-860. Therefore, interest and overhead are appropriately included in the Taxpayer's unit value.

"Inventory

"28. PVD included inventory items in the unit valuation of the Taxpayer's property. The Taxpayer did not identify any of its inventory that has been inappropriately valued, assessed, and taxed in Kansas.

"Allocation of Unit Valuation to Kansas

"29. The process of dividing up the unit value of a company among the states where it has a presence is called allocation. The process of dividing up the allocated state value among the taxing jurisdictions within a state is called apportionment.

"30. PVD used original cost to allocate all public utility unit values to Kansas for the tax years in question. This includes all pipeline companies subject to state assessment and all other companies whose values are required to be apportioned by K.S.A. 79-5a25.

"31. There are twenty-eight states that use various allocation factors to allocate public utility unit values. Of these, nine states, including Kansas, use original cost as the sole allocation factor. Ten states use original cost along with other factors to allocate unit value.

"32. Original cost is used by FERC to allocate expenses, plant, and intangibles.

"33. The taxpayer used original cost to allocate deferred federal income taxes to the states in which they operate.

"34. Allocation factors are not designed to determine the fair market value of assets in a particular location, but are designed to determine a reasonable apportionment of a unit's value to such assets. All allocation processes are arbitrary and may import or export value to a state. However, even though allocation processes may be arbitrary in nature, the process used to allocate value must have some relation to the assets whose value is being allocated. Allocation is not an appraisal process.

"35. Original cost as an allocation factor accounts for the amount of investment made throughout the utility system, the quantity of utility property at different locations, the age of the utility property and has a high correlation with income.

"36. Michael W. Goodwin, PVD's expert witness, compared PVD's original cost allocation factors for the subject tax years with allocation factors obtained by the use of other generally recognized allocation methodologies, such as inch miles and MCF miles of transmission lines, as well as horsepower hours of compressors, and he concluded that PVD's original cost allocation factors for the tax years in question were reasonable.

"37. No state uses rate base to allocate unit value either alone or in conjunction with other factors. Rate base is not recognized as a generally accepted appraisal methodology for allocating unit value.

"38. Fully depreciated assets receive no allocated value when rate base is used as an allocation factor. The Taxpayer has assets in service in Kansas which have been fully depreciated for purposes of FERC's rate base determination. The Taxpayer has 28.4% of its assets in Kansas fully depreciated. A fully depreciated pipeline is not part of the rate base and therefore, is not part of the rates. However, such pipeline can still transmit volumes of gas. Once the rate is approved by FERC, that rate is multiplied times the volume of gas transmitted to generate income for the Taxpayer. Therefore, fully depreciated assets generate income for the Taxpayer, even though they are not included in the rate base.

"39. No evidence was presented establishing that the use of original cost as the sole allocation factor imported or exported value to Kansas. However, it is uncontested that the use of original cost as a sole allocation factor may import or export value."

The parties disagree about the significance of BOTA's factual findings. CIG contends that those facts relied upon by BOTA distort the overall picture and fail to support BOTA's conclusions of law. The PVD cites additional facts in the record to support the legal conclusions of BOTA. Before examining the allegations of the parties we first address CIG's contention that BOTA again failed to apply the correct standard of review. Equally important to our own decision is the identification of our standard of review of the BOTA decision.

## I. BOTA STANDARD OF REVIEW

CIG contends that BOTA paid only lip service to our mandate and again deferred to the PVD's judgment. Resolution of this issue necessarily requires consideration of what we said in *Colorado Interstate Gas*, regarding BOTA's standard of review. In our reversal of BOTA's prior decision, we concluded that BOTA erred by pay-

ing deference to the PVD. BOTA's appropriate standard of review is as follows:

"The law in Kansas is clear. It is the duty of BOTA, in reviewing a valuation by the PVD, to exercise its judgment anew based on the evidence presented to it at the hearing and without giving deference to the PVD's valuation. K.S.A.1996 Supp. 74-2438." 270 Kan. at 318.

We rejected the PVD's argument that BOTA exercised its judgment anew in light of the language used by BOTA that the taxpayer had a duty to show that the PVD "had intentionally and grossly disregarded the standards in order to prevail." 270 Kan. at 318-19.

In an attempt to demonstrate that BOTA again applied an incorrect standard of review, CIG points to language in the BOTA decision which stated that CIG failed to establish by a preponderance of the evidence that the PVD's unit valuation and apportionment to Kansas was in error. CIG points to the following language in the BOTA decision which it claims supports its contention that BOTA again yielded to the PVD's determination:

"46. The *Taxpayer has the burden of proof to show by a preponderance of the evidence that the Director has not appropriately valued and allocated the valuation* as prescribed by K.S.A. 79-5a04.

. . . .

"49. The Board finds that PVD used appropriate methodologies and *came to a rational conclusion* in its determination of the appropriate capitalization rate for large gas transmission companies for the tax years in question. *The Taxpayer has not provided sufficient evidence to show that PVD's rates are in error.* Based on the foregoing, the Board finds that the appropriate capitalization rate for tax year 1993 was 11%, for tax year 1994 was 11% and for tax year 1995 was 11.5%.

. . . .

"56. While the Board does not agree with the Director that he is 'required' to allocate public utility unit valuation to Kansas by use of original cost, the director may use original cost if it is a generally accepted appraisal procedure and it results in the taxpayer's property located in Kansas being valued at fair market value. As noted previously, K.S.A. 79-5a25 requires that the apportionment of the assessed valuation to the various taxing jurisdictions in Kansas is to be in proportion to original cost. K.S.A. 79-5a04 and 79-5a25, read *in pari material*, provide a two-step process to first allocate, and then apportion, unit valuation to Kansas. Testimony was that PVD for the years at issue herein did perform the two-step process. However, as contended by the Director in his brief on pages 14-15 and by Mr. Badenoch in his testimony, the process of allocation and apportionment need not be a two step process if each taxing jurisdiction's share of the whole can be directly

determined, as it can in Kansas. *The Board concludes that the Director's interpretation is reasonable, has a rational basis, and should be upheld.*

. . . .

"68. *The Board finds that the Taxpayer has not shown by a preponderance of the evidence that PVD's unit valuation and apportionment to Kansas is in error.* After considering the standards prescribed by K.S.A. 79-5a04, the Board concludes that the correlated unit value of the Taxpayer's property for 1993 is $525,000,000, for 1994 is $465,000,000 and for 1995 is $430,000,000. The Board further concludes that the fair market value of the Taxpayer's property allocated to Kansas for 1993 is $50,820,480, for 1994 is $48,041,475, and for 1995 is $44,549,720." (Emphasis added.)

CIG argued that the above language makes clear that BOTA once again gave deference to the PVD and required that CIG shoulder the burden of providing that the PVD erred. CIG noted that it should have no burden to show that the PVD erred or to negate the contentions of the PVD but argued that its burden is limited to showing by a preponderance of evidence that its proposed values are correct. We agree that CIG's burden before BOTA was to establish by a preponderance of evidence that its proposed values are correct. We, however, disagree that the above language in the BOTA decision provided a basis for concluding that BOTA gave deference to the PVD in its decision on the fair market value of CIG's property in Kansas.

Following remand, the proceeding continued with an agreement by the parties to consider the matter based upon the existing record. At that point, the record contained the PVD's determinations as to CIG's value, together with all supporting evidence. CIG's value, together with its supporting evidence, was also before BOTA. In order to prevail before BOTA, the burden fell upon CIG to establish by a preponderance of the evidence the accuracy of its valuation. BOTA recognized its role when it said that CIG "has the burden of proof to show by a preponderance of the evidence that the [PVD] has not appropriately valued and allocated the valuation as prescribed by K.S.A. 79-5a04." In other words, CIG's burden was to show that the PVD was wrong and the value it asserted was supported by substantial competent evidence. Thus, BOTA was giving no deference to the PVD except to say that when the PVD established evidence that its valuation was accurate, CIG must nec-

essarily attack and undermine the PVD's valuation. It is up to BOTA which side presents the most compelling case.

CIG argues that Paragraph 46, quoted above, shows how BOTA deferred to the PVD's judgment. Within this context, BOTA's statement that the taxpayer has the burden of proof to show by a preponderance of the evidence that the director has not appropriately valued and allocated the valuation, as prescribed by K.S.A. 79-5a04, is another way of saying that the burden lies with CIG. In order for CIG to prove its valuation, it would be required to prove that the PVD valuation was incorrect.

CIG also complains that evidence of BOTA deference is found in Paragraph 49, where BOTA said that the PVD came to rational conclusions. However, BOTA also said in the same sentence that the PVD's methodologies were appropriate. Consistent with exercising judgment anew, it would be logical for BOTA to adopt conclusions reached by "appropriate" methodologies. BOTA determined anew that the original cost was the appropriate method to determine fair market value of CIG properties in Kansas. This method was advanced by the PVD and rejected by CIG, providing BOTA with a choice among the many methods set forth in K.S.A. 79-5a04. BOTA selected the most appropriate method, which was also the method used by the PVD

CIG argued that BOTA erred by using language in Paragraph 56 when it said that the PVD's "interpretation is reasonable, has a rational basis, and should be upheld." We do not believe BOTA's language indicates that it ignored its standard of review. BOTA is faced with a decision between two competing positions as to value. Key to its decision is the process used by each in ascertaining such value. The allocation process used by each party is key to its final decision. In determining that the PVD's interpretation is reasonable, BOTA has determined that the evidence as a whole supports the determination made by the PVD, not that deference must be given to the PVD. The language used by BOTA demonstrates to this court that BOTA understood the role it was required to play in its determination of value.

In Paragraph 68, when BOTA said in its original order on remand that CIG has not showed "by a preponderance of the evi-

dence that the PVD's unit valuation and apportionment of value to Kansas is in error," it was also saying that the PVD had shown by a preponderance of evidence that its valuation was correct. In its brief on appeal, CIG failed to offer a complete quotation of Paragraph 68, which indicates BOTA's conclusions with respect to the unit value and the allocation of that value to Kansas. Unlike the previous appeal, there is no indication that BOTA relied on an intentional and gross disregard standard of review or deferred to the PVD in determining fair market value in Kansas. See *Colorado Interstate Gas*, 270 Kan. at 315.

BOTA understood the mandate of this court in *Colorado Interstate Gas*. BOTA applied a correct standard of review as demonstrated in its order denying CIG's motion for reconsideration:

"5. The Taxpayer asserts that the Board did not exercise its judgment anew, but instead, found that the Taxpayer did not meet its burden to show that the Director has not appropriately valued and allocated the valuation. The Taxpayer further argues that the Board's standard of review inherently gives deference to the Director's valuation in direct contravention of the Supreme Court's remand. The Board believes the Taxpayer has misinterpreted the Board's findings and conclusions.

"6. The Board is well aware that the standard of review requires that the Board exercise its judgment anew based on the evidence presented and without giving deference to the Director's valuation. The Taxpayer's argument in these matters is basically that the Director has excessively valued and allocated the valuation of the Taxpayer's property. The Taxpayer must provide evidence to show that the Director's valuation is in error and the Director must provide evidence in support of his valuation. The Board must review the evidence provided and by applying the factors enumerated in K.S.A. 79-5a04 determine the appropriate valuation and allocation of the Taxpayer's property. In these matters, the Board gave no deference to the Director's valuations, but rather reviewed the evidence presented and concluded by the weight of the evidence that the appropriate unit valuation for 1993 is $525,000,000 (now corrected to $510,000,000), $465,000,000 for 1994 and $430,000,000 for 1995, which are the same as determined by the Director. The Board further concluded that the fair market value of the Taxpayer's property allocated to Kansas for 1993 is $50,820,480, for 1994 is $48,041,475, and for 1995 is $44,549,720, which are the same as determined by the Director."

Nevertheless, CIG argues that a decision on whether BOTA applied the correct standard of review should be determined by considering the record as a whole, not by considering what BOTA said in its order denying reconsideration. Further, CIG argues that

BOTA's order denying reconsideration does not negate the admissions of deference in BOTA's original order since BOTA's figures matched those of the PVD's despite the subjective nature of the judgment exercised by the PVD.

The fact that BOTA's figures matched those of the PVD's provides little if any evidence that BOTA applied a deferential standard of review. CIG is right that this determination must be made from the record as a whole. If BOTA is to be believed, it gave no deference to the PVD in its determination of value. However, we must point out that initially it was the responsibility of the PVD to value CIG's property for ad valorem taxation in Kansas. It did so based upon the judgment of its experts and all of the factors which are now before this court. The proceeding before BOTA started with the PVD's determination of value and its contention before BOTA that fair market value in Kansas was established. The assessment had been made by the PVD. Before BOTA, the PVD presented its testimony and CIG presented its testimony and its determination of fair market value in Kansas.

CIG had the burden to establish that the determination by the PVD was invalid based upon the record as a whole. Based upon all evidence presented, BOTA concluded that CIG failed to meet its burden, thus providing a basis for concluding that the valuation determined by the PVD was correct. Instead of giving deference to the PVD by adopting its valuation, BOTA determined that the record supported the determination made by the PVD. To say that BOTA adopted the PVD's values without any consideration of the evidence ignores the record as a whole as well as BOTA's expressed conclusion that its determination was made anew based upon all the evidence presented.

## II. OUR STANDARD OF REVIEW

In reviewing a BOTA decision, several well-established principles govern. BOTA is a specialized agency and is considered to be the paramount taxing authority in this state. *Wirt v. Esrey*, 233 Kan. 300, 314, 662 P.2d 1238 (1983). BOTA is a specialized agency that exists to decide taxation issues. *Hixon v. Lario Enterprises, Inc.*, 257 Kan. 377, 378-79, 892 P.2d 507 (1995). Its decisions are

given great weight and deference when it is acting in its area of expertise. *In re Tax Appeal of Boeing Co.*, 261 Kan. 508, 515, 930 P.2d 1366 (1997). The party challenging BOTA's decisions has the burden to prove that the action taken was erroneous. *Board of Ness County Comm'rs v. Bankoff Oil* Co., 265 Kan. 525, 537, 960 P.2d 1297 (1998). However, if BOTA's interpretation of law is erroneous as a matter of law, appellate courts will take corrective steps. *In re Tax Appeal of Family of Eagles*, LTD, 275 Kan. 479 Syl. ¶ 1, 66 P.3d 858 (2003).

Orders of BOTA are subject to judicial review under the Act for Judicial Review and Civil Enforcement of Agency Actions. See K.S.A. 77-601 *et seq.*; K.S.A. 74-2426(c); *In re Appeal of Topeka SMSA Ltd. Partnership*, 260 Kan. 154, 162, 917 P.2d 827 (1996). In reviewing BOTA decisions, this court determines whether relief is warranted under the provisions of K.S.A. 77-621(c), which provides:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

"Arbitrary or capricious" may be established under K.S.A. 77-621(c)(8) where an administrative order is not supported by substantial evidence. *Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 365, 770 P.2d 423 (1989). "Substantial evidence is evidence which possesses both relevance and substance so as to form a basis of fact from which the issues can be reasonably

resolved. [Citation omitted.]" *Dalmasso v. Dalmasso*, 269 Kan. 752, 758, 9 P.3d 551 (2000).

## III. ALLOCATION METHODOLOGY

With these principles firmly in mind, we recognize that the primary dispute between the parties in this case centers upon allocation. CIG argued allocation by original cost was error because the Kansas assets are relatively depreciated when compared to CIG's system-wide assets. The PVD argued that original cost allocation was the best measure of the fair market value of CIG's Kansas assets. Contrary to the arguments of CIG, the questions presented with reference to allocation are factual and not legal questions. The method used by the PVD and adopted by BOTA to partially determine the fair market value of CIG's property in Kansas is one identified by Kansas statute, K.S.A. 79-5a04(a).

The fundamental issue involves BOTA's selection of an original cost allocation factor in valuing CIG's Kansas property. CIG contends that BOTA erred because it disregarded its mandate from this court in the prior appeal to determine the fair market value of CIG's operating property in Kansas. More specifically, CIG argues that BOTA erred (1) as a matter of law in failing to determine whether original cost allocation achieved fair market value, (2) in failing to address the issue of whether any allocation technique was capable of achieving market value, and (3) in finding original cost allocation "reasonable" or "rational" as a matter of fact without substantial competent evidence to support such factfinding.

As demonstrated by the facts, the PVD first valued all of CIG's property for the years in question, thereby arriving at the unit value. In order to ascertain the unit value for the years in question, the PVD used an income approach, a cost approach, and the market approach to arrive at a correlated unit value of CIG's property for 1993 of $510,000,000, for 1994 of $465,000,000, and for 1995 of $430,000,000. BOTA examined these values, and based upon the evidence concluded that these unit values accurately reflected CIG's unit values for the years in question. Although unit valuation was a significant issue before BOTA, on appeal CIG takes no issue

with unit values and accepts the PVD's correlated unit values for the years in question.

The question of how much of the unit value is represented in Kansas to reach the fair market value of public utility property in Kansas is a question addressed in K.S.A. 79-5a04, which provides:

"The division of property valuation in determining the *fair market value* of public utility property shall, *where practicable*, determine the unit valuation, allocated to Kansas, and in doing so shall use generally accepted appraisal procedures developed through the appraisal process and may consider, including but not by way of exclusion, the following factors:

"(a) Original cost.

"(b) Original cost less depreciation or reproduction cost less depreciation, or both, or replacement cost new less depreciation, except that where either method is used proper allowance and deduction shall be made for functional or economic obsolescence and for operation of nonprofitable facilities which necessitate regulatory body approval to eliminate.

"(c) The market or actual value of all outstanding capital stock and debt.

"(d) The utility operating income, capitalized in the manner and at such rate or rates as shall be just and reasonable.

"(e) Such other information or evidence as to value as may be obtained that will enable the property valuation department to determine the fair market value of the property of such public utility."

BOTA considered the provisions of K.S.A. 79-5a04, the PVD's use of original cost and the evidence supporting original cost, together with CIG's objections to original cost and the evidence offered by CIG. BOTA concluded that original cost allocation was a reasonable method of arriving at the fair market value of CIG's property in Kansas. In its review of PVD's use of original cost allocation, BOTA noted that "[the PVD] may use original cost if it is a generally accepted appraisal procedure and it results in the taxpayer's property located in Kansas being valued at fair market value."

In its findings, BOTA set forth the appropriate formulas for arriving at an allocation factor in order to determine the portion of the unit value attributable to Kansas as required by K.S.A. 79-5a04 and discussed at length in the record:

"40. The original cost, net book, rate base, and income allocation formulas are as follows: (OC = Original Cost; Dep. = Depreciation; DFIT = Deferred Federal Income Taxes)

Original Cost:

Kansas allocation % $=$ $$\frac{\text{Original Cost of Kansas Assets}}{\text{Original Cost of System Assets}}$$

Net Book:

KS allocation % $=$ $$\frac{\text{OC of KS Assets - Dep. on KS Assets}}{\text{OC of System Assets - Dep. on System Assets}}$$

Rate Base:

KS allocation % $=$ $$\frac{\text{OC of KS Assets - Dep. on KS Assets - DFIT}}{\text{OC of System Assets - Dep. on System Assets - DFIT}}$$

Income Based:

KS allocation % $=$ $$\frac{\text{Income from Kansas Assets}}{\text{System Income}}$$

"41. As shown in the above formulas, a net book allocation formula and a rate base allocation formula are cost-based. The difference between the original cost formula and net book is that net book is original cost minus FERC approved depreciation. The difference between the original cost formula and rate base is that rate base is original cost minus FERC approved depreciation and Deferred Federal Income Taxes.

"42. An income based allocation formula may theoretically be the best formula. However, no income based formula was introduced into evidence in this matter; therefore, an income based allocation formula is not an option for the Board to adopt. Further, such a formula would require the income that the taxpayer earned from its Kansas property. There is no evidence of such income in these matters."

Thus, according to BOTA only cost-based formulas were available to allocate the unit value to reach the fair market value of CIG's property in Kansas. CIG disagreed and contended that BOTA erred in finding no income-based allocation factors were available. CIG argued that since unit value was determined principally by an income approach, income contribution would then be the most logical approach to allocation. CIG suggested that the record is replete with income-based formulas and immediately launched into the benefits of using rate base or net book cost for allocating system values to Kansas because of their relationship to income. It is difficult to follow this argument, for rate base and net book cost are both cost-based formulas.

BOTA rejected an income-based formula because no data supporting an income-based formula was introduced into evidence.

The record supports this conclusion. While rate base and net book cost may relate to income, neither are income formulas. To obtain an income allocation factor, one must have evidence of the income CIG generates from its Kansas assets. The record does not contain such evidence, and BOTA correctly concluded that based upon the evidence presented only cost-based formulas are available to determine the fair market value of CIG's property in Kansas.

BOTA adopted allocation by original cost as noted above and determined the unit value for 1993 ($510,000,000). The original cost of CIG's Kansas assets is divided by the original cost of CIG's system-wide assets in order to obtain the factor (0.099648), which is then multiplied by CIG's unit value for 1993, to obtain the fair market value of CIG's Kansas property ($50,820,480) for ad valorem tax purposes in Kansas. The same process was used to determine the fair market value of CIG's property allocated to Kansas for 1994 and 1995. The factor used for 1994 was 0.103315 and for 1995 was 0.103604. After each factor was multiplied by the unit value, the fair market value of CIG's property allocated to Kansas for 1994 and 1995 was determined to be $48,041,475 and $44,549,720 respectively.

Relying on its experts and the net book cost method of allocation, CIG advocated a factor of 0.0591 for 1993, 0.0598 for 1994, and 0.0617 for 1995, which resulted in value allocated to Kansas of $30,141,000 for 1993, $27,807,000 for 1994, and $26,531,000 for 1995.

CIG attacks the original cost method as a method that will never result in a fair market value of its Kansas property. CIG argues that rate base, because it is more closely tied to CIG's income in Kansas, is a far superior allocation method. The same may be said of net book cost according to CIG.

## A. BOTA DECISION REGARDING ORIGINAL COST ALLOCATION

Consistent with our standard of review we conclude that BOTA's decision to use the original cost allocation method is supported by substantial evidence. For BOTA, this was the primary issue to be

resolved. Thus, we believe it helpful to set forth those conclusions in the BOTA decision relating to this issue.

## "ANALYSIS

"47. The Taxpayer argues that there is a close relationship between its rate base and the market value of its operating property. However, the Taxpayer is not arguing that the unit valuation should be equivalent to its rate base.

. . . .

"54. Once the unit valuation is determined, a determination must be made as to what portion of the unit value is taxable in Kansas (allocation). See K.S.A. 79-5a04. Then a further decision must be made as to the tax situs in Kansas where the taxpayer's taxable property will be assessed (apportionment). See K.S.A. 79-5a25.

"55. The Director may, but is not required to, consider original cost in arriving at the unit valuation and in allocating the unit value to Kansas. In fact, K.S.A. 79-5a04 only requires that the Director use generally accepted appraisal procedures in determining the unit valuation and in allocating unit values. In doing so, the Director may consider the factors listed therein, including original cost, as well as other factors not listed therein. There is no requirement that the Director has to use original cost, or any of the other factors listed therein. What factors are relevant depends on the individual type of property, after consideration of all the factors within the scope of generally accepted appraisal procedures. *Northern Natural Gas Co. v. Dwyer,* 208 Kan. 337, 356, 492 P.2d 147 (1971). Finally, there is no requirement that the Director is to consider or use other allocation methodologies. K.S.A. 79-5a04 merely states that the Director 'may' consider the factors listed therein. There is no requirement that the factors 'shall' be considered or used by the Director.

"56. While the Board does not agree with the Director that he is 'required' to allocate public utility unit valuation to Kansas by use of original cost, the director may use original cost if it is a generally accepted appraisal procedure and it results in the taxpayer's property located in Kansas being valued at fair market value. As noted previously, K.S.A. 79-5a25 requires that the apportionment of the assessed valuation to the various taxing jurisdictions in Kansas is to be in proportion to original cost. K.S.A. 79-5a04 and 79-5a25, read in *pari materia,* provide a two-step process to first allocate, and then apportion, unit valuation to Kansas. Testimony was that PVD for the years at issue herein did perform the two-step process. Badenoch, Transcript pp. 766-769; PV Exhibits 3a, 4a & 5a. However, as contended by the Director in his brief on pages 14-15 and by Mr. Badenoch in his testimony, the process of allocation and apportionment need not be a two-step process if each taxing jurisdiction's share of the whole can be directly determined, as it can in Kansas. Badenoch, Transcript pp. 722-727, 761-762, 766-769, 776-781. The Board concludes that the Director's interpretation is reasonable, has a rational basis, and should be upheld.

"57. The Director's consistent use of original cost to allocate the large gas transmission public utility unit values to Kansas achieves uniformity and equality in the valuation and assessment process in Kansas. Further, it is a generally accepted appraisal methodology and it is a reasonable method of allocating public utility values to the situs of the property for taxation purposes.

"58. K.S.A. 79-5a04 requires that the Director use, where practicable, the unit valuation methodology for valuing public utilities. Unit valuation has been found to be a valid method in valuing and taxing property of a public utility. See *In re Tax Appeal of Colorado Interstate Gas Co.*, No. 83288, 14 P.3d 1099 (2000); *In re Tax Appeal of Western Resources, Inc.*, 22 Kan. App. 2d 593, 602, 919 P.2d 1048, *rev. denied* 260 Kan. 993 (1996) and cases cited therein. The unit valuation is to be representative of the fair market value of the Taxpayer's property. The allocation may be according to any generally accepted appraisal methodology with the goal being a determination of the fair market value of the public utility's property in Kansas. As testified by Mr. Goodwin, it must be kept in mind that allocation is not an appraisal process. Transcript p. 928. The Kansas Supreme Court in dicta has acknowledged the unit valuation methodology and apportionment to Kansas using original cost as meeting the requirements set forth by the United States Supreme Court in *Commonwealth Edison Co., v. Montana*, 453 U.S. 609, 69L. Ed. 2d 884, 101 S. Ct. 2946 (1981). See *In re Tax Appeal of ANR Pipeline Co.*, 254 Kan. 534, 547, 866 P.2d 1060 (1993). The Kansas Supreme Court indicated that the unit valuation methodology, and apportionment to Kansas according to original cost, results in a pipeline company's property being assessed in Kansas in proportion to the pipeline's presence in Kansas. The question is whether the resulting apportionment is representative of the fair market value of the pubic utility's property in Kansas.

"59. The Taxpayer has argued that there are three rules that apply to determining whether the allocated value represents fair market value. First, one looks at the contribution of the assets in Kansas in terms of their contribution to the unit as a whole. As indicated previously, 28.4% of the Taxpayer's Kansas assets are fully depreciated and do not contribute to rate base. However, these assets do contribute to the transportation of gas for the Taxpayer.

"60. The second rule is that it is best when all states where a public utility has property use the same allocation methodology. This reduces the risk of importing to a state or exporting from a state value that should or should not be allocated to that state. In theory, the sum of values allocated to each state should equal the total value of the unit. There is no evidence of the values allocated to the other states where the Taxpayer has property.

"61. The third rule is that it is best to employ the same model in allocation as is used in unit valuation. The income approach is the preferred approach for unit valuation and would be for allocation. However, as indicated previously, no income based allocation formula has been introduced into evidence. Original cost, net book and rate base allocation formulas are all cost-based formula. Also PVD

used a correlated unit valuation for each year that is a blend of the income, cost and market approaches to value.

"62. The Board is not convinced that rate base, net book cost, or a blend of rate base and net book cost should be used to allocate the unit valuation of public utility property to Kansas. K.S.A. 79-5a04 requires that whatever allocation methodology is used, it is to be a generally accepted appraisal procedure. No state uses rate base to allocate unit value either alone or in conjunction with other factors. Therefore, rate base is not a generally accepted appraisal procedure for allocating unit value.

"63. Further, a rate base allocation methodology would result in fully depreciated assets receiving no allocation of unit value. Since the Taxpayer has fully depreciated assets in Kansas that are still in service and provide value to the system by generating income, use of rate base would result in those assets receiving no allocated value. In effect, fully depreciated assets would not be subject to ad valorem tax by this allocation approach.

"64. Net book cost is not appropriate because it uses FERC's depreciation rates. Net book cost does not accurately account for fully depreciated property that is being used to the same extent as newer property. Hughes, Transcript pp. 657-660; Rumsey, Transcript pp. 669-670. Net book cost is the net amount at which assets are carried on a company's books or financial statement. There is no more correlation between net book cost and market value than there is between original cost and market value.

"65. There was no proof that original cost as the allocation factor imports value to Kansas beyond the actual value of the Taxpayer's assets in Kansas. However, even if there were importing of value, a state's allocation methodology is not invalid simply because it imports value. *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 169, 77 L. Ed. 2d 545, 556, 103 S. Ct. 2933, 2942, *reh. denied* 464 U.S. 909, 78 L. Ed. 2d 248, 104 S. Ct. 265 (1983). There must be a showing that the allocation methodology imports value into the state grossly out of proportion to the Taxpayer's presence in the State of Kansas. There is no such showing here by the Taxpayer.

"66. In K.S.A. 79-5a04, the Legislature has defined fair market value and has indicated that original cost is one method of determining fair market value of a public utility property. The Legislature has specifically provided for the exercise of appraisal judgment in the allocation of unit value by including various factors in K.S.A. 79-5a04 that may be considered by PVD in valuing public utility properties. If it is the fair market value of the public utility's property in Kansas that is to be determined, we have to assume that a willing buyer and willing seller would look only at the assets in Kansas. The fully depreciated assets of the Taxpayer would add value because without these assets, the pipeline would not be able to transport gas.

"67. PVD used original cost to allocate all public utility unit values to Kansas for the tax years in question, including ANR, which is on appeal to this Board for

the same tax years, and in which the Taxpayer has not raised the issue of allocation. The Board finds the following allocation factors for the Taxpayer:

| 1993 | 0.099648 |
|------|----------|
| 1994 | 0.103315 |
| 1995 | 0.103604 |

## "SUMMARY

"68. The Board finds that the Taxpayer has not shown by a preponderance of the evidence that PVD's unit valuation and apportionment to Kansas is in error. After considering the standards prescribed by K.S.A. 79-5a04, the Board concludes that the correlated unit value of the Taxpayer's property for 1993 is [$510,000,000], for 1994 is $465,000,000 and for 1995 is $430,000,000. The Board further concludes that the fair market value of the Taxpayer's property allocated to Kansas for 1993 is $50,820,480, for 1994 is $48,041,475, and for 1995 is $44,549,720."

Two members of BOTA dissented on the issue of original cost allocation. While they rejected rate base as an allocation method, they would have adopted net book cost because it is most directly related to CIG's income earning capacity, finding that there must be an appropriate linkage between the income method used to value the unit and the allocation method. The dissent notes that net book cost is a generally accepted approach to allocation and, with the exception of Kansas, is used by every state in which CIG has operating properties. The dissent noted that all experts identified the flaws with using original cost, some of which include the failure to consider relative age of properties, relative depreciated status of property, the relative contributions to income of property throughout the system, and the likely result of importation of value to Kansas from other states. In addressing the deficiency of fully depreciated property escaping taxation in Kansas, the dissent notes that focus on individual assets is inconsistent with unit value allocation, recognized authorities do not perceive the failure to tax fully depreciated property as a problem, and every state in which CIG operates has some heavily depreciated assets, yet all of these states use net book allocation. Thus, the dissent concludes that net book cost as an allocation factor results in allocation of value to Kansas that more accurately reflects the fair market value of CIG's property in Kansas.

The majority and dissenting decisions highlight the difficult task we face. Substantial evidence based upon this voluminous record may support the dissenting decision, but this conclusion is irrelevant to this case. We must decide whether substantial competent evidence supports the BOTA majority decision, and we have concluded that such evidence does support the majority decision. Perhaps because of the close nature of the case, CIG argued that our standard of review is not factual but rather one of law. At the same time CIG argued that in the event we review BOTA's decision on this issue as a question of fact, substantial evidence fails to support BOTA. In our review we reiterate a familiar legal maxim:

" 'When findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, the duty of the appellate court extends only to a search of the record to determine whether substantial competent evidence exists to support the findings. An appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances the reviewing court must review the evidence in the light most favorable to the party prevailing below. [Citation omitted.]' " *In re R. W. B.*, 27 Kan. App. 2d 549, 550, 7 P.3d 306, *rev. denied* 270 Kan. 898 (2000) (quoting *Aslin v. Seamon*, 225 Kan. 77, 78, 587 P.2d 875 [1978]).

See *Clark v. Clark,* 236 Kan. 703, 704, 696 P.2d 1386 (1985) ("If there is substantial evidence to support the findings it is of no consequence that there may have been contrary evidence adduced which, if believed, would have supported a different finding.").

CIG attempted to make this issue one of law by arguing that original cost allocation will never result in a fair market value. In this attempt, CIG keys on evidence offered by the experts, all of whom had difficulty with allocation. By its very nature, allocation is a process by which one attempts to determine how much of the whole or unit value is to be assigned to an individual state. CIG defines allocation as a "mathematical process for determining that portion of 'unit' value or system value that resides in a given state within the taxpayer's system." BOTA recognized from the evidence presented that "[t]he process of dividing up the unit value of a company among the states where it has a presence is called allocation." The important point to remember, as noted by BOTA in its decision, is that "[a]llocation factors are not designed to deter-

mine the fair market value of assets in a particular location, but are designed to determine a *reasonable apportionment* of a unit's value to such assets."

CIG objected to the arbitrary nature of the system of allocation and particularly an original cost method of allocation. CIG advanced the argument that original cost allocation, as a matter of law, never achieves fair market value: "Original cost will always fail unless there is perfect uniformity among all states in relative status of depreciation for assets within each state. Since this condition is rarely if ever the case, original cost allocation is theoretically, mathematically, and logically doomed as a fair market value approach."

We disagree. Original cost is an acceptable method of allocation as stated in K.S.A. 79-5a04. It is a method used in Kansas for all public utilities. It was a method deemed reasonable by BOTA in achieving the fair market value of CIG's property in Kansas. While rejected by CIG in place of advocating net book or rate base method which are also acceptable under K.S.A. 79-5a04, it remains an acceptable method of allocating value in Kansas. BOTA, in its decision, deemed the use of original cost allocation reasonable based upon all the evidence, and the question is not one of law but rather one of fact which must be reviewed by this court.

It must be noted that our decision in the prior case, did not direct BOTA to scrap the unit valuation process:

"This does not mean that the unit valuation process is invalid in Kansas. *It is the favored method of valuation for property owned by a public utility in Kansas.* However, if in allocating value to Kansas property, the resulting value does not represent the fair market value of the utility's property in Kansas, other methods provided for by K.S.A. 79-5a04 must be used to determine the fair market value [of] the utility's Kansas property." (Emphasis added.) *Colorado Interstate Gas*, 270 Kan. at 321.

K.S.A. 79-5a04 requires the PVD to "annually determine the fair market value of public utility property." This court in the prior appeal summarized the statute as follows:

"A plain reading of the statute supports the following conclusions: (1) The PVD shall annually determine the fair market value of the public utility property; (2) if practicable, the fair market value of public utility property is determined by using the unit valuation method and then allocating that value to Kansas; and (3) in so

doing, the PVD may use a variety of methods with the ultimate goal being a determination of the fair market value of the public utility's property in Kansas, considering the property as part of a going concern." *Colorado Interstate Gas*, 270 Kan. at 320.

BOTA's decision echos what experts acknowledge about allocation. Such methods are arbitrary in nature in that the process attempts to allocate value from the unit to a particular location, a state within an interstate system. Ideally appraisers in the field could examine each item of property located in the state and thereby accurately reach the enterprise's fair market value. However, reality does not permit such a process. Instead, a system of allocation must be used as demonstrated by the record as a whole. CIG questions how an arbitrary process can be reasonable. The answer is that if the "arbitrary" process is the best reflection of fair market value in the particular state, the process achieves, by definition, fair market value. BOTA's inquiry, and the one we review under our standard of review, is whether allocation by original cost reflects the fair market value of CIG's properties in Kansas.

The record supports BOTA's use of original cost allocation. Testimony before BOTA indicated original cost has a high correlation to investment, age, and public utility income. When asked how he determined whether a factor is acceptable, Michael Goodwin, an expert appraiser called by the PVD, testified that the factor must be tested to determine whether it is allocating the entire value of the unit across states and whether the factor relates properly to records and the data that we can observe at that system level and at that total company level. Goodwin testified that original cost was a usable factor because it reflects the amount of investment made throughout a system. Further, Goodwin testified that original cost, through the effects of inflation, reflects the relative age of the properties across states. Goodwin testified that for the amount of money to purchase 1 mile of pipe in 1994, CIG could have purchased 6 miles in 1954, 5 miles in 1959, 4 miles in 1967, 3 miles in 1970, and 2 miles in 1975. Thus, original cost does not ignore the relative age of properties across state lines.

Robert Badenoch, an employee of the PVD, testified that the allocation by original cost, if used by all states, would allocate no

more than and no less than the full value of CIG's property. According to Badenoch, 8 other states use original cost as an exclusive factor, and 19 use original cost along with other factors as an allocation factor. Further, Badenoch testified that the PVD consistently used allocation by original cost for all similarly situated companies.

## B. RATE BASE AND NET BOOK COST

BOTA noted that original cost more closely reflected fair market value when "one looks at the contribution of the assets in Kansas in terms of their contribution to the unit as a whole." The question presented to this court on review is not one of law but a question of fact. More specifically, the question is whether BOTA's decision in using the original cost method to arrive at fair market value of CIG's property in Kansas is supported by "substantial [evidence] when viewed in light of the record as a whole," K.S.A. 77-621(c)(7), or is "otherwise unreasonable, arbitrary or capricious," K.S.A. 77-621(c)(8). In the record before us, we find substantial competent evidence to support BOTA's finding.

BOTA concluded that no state uses rate base to allocate unit value either alone or in conjunction with other factors. Ample evidence in the record supports this conclusion. Thus, BOTA properly rejected rate base.

Net book cost allocation results in fully depreciated assets receiving no allocation of unit value. Yet, CIG's fully depreciated assets in Kansas are in service and provide value to the system by generating income. This value, fully 28.4% of CIG's property in Kansas, would escape ad valorem tax by using a depreciated cost allocation. Testimony before BOTA demonstrated that because CIG's income is determined based upon the volume of gas flowing though its system, net book cost allocation does not accurately account for fully depreciated property that is being used to the same extent as newer property. BOTA notes that there is no more correlation between net book cost and market value than there is between original cost and market value. Ample evidence supports these conclusions.

CIG argued that original cost allocation imports value into Kansas and distorts the resulting fair market value of CIG's Kansas assets. CIG, however, presented no evidence that the original cost method imported value into the state out of proportion to CIG's presence in Kansas. CIG argued that its method, the allocation based on net book value, was the only accurate method of arriving at fair market value and then using this method argued that the evidence clearly demonstrated that original cost allocation nearly doubled the valuation of CIG's Kansas assets. CIG's conclusion that allocation by original cost resulted in the importation of value rests upon the conclusion rejected by BOTA that its allocation by net book value was an accurate indicator of CIG's property in Kansas. However, CIG's argument presented no evidence that original cost imported value into Kansas but merely supports the finding that there is a marked difference in values between CIG's method of calculation and the one used by the PVD.

## C. VIOLATION OF THE KANSAS AND UNITED STATES CONSTITUTIONS

CIG argued that BOTA's allocation of its unit value violated the Kansas and United State Constitutions. CIG cites the United States Constitution Commerce Clause and *Norfolk & W. R. Co. v. Missouri Tax Comm'n,* 390 U.S. 317, 19 L. Ed. 2d 1201, 88 S. Ct. 995 (1968).

*Norfolk* considered due process and the Commerce Clause challenges to state taxation of an interstate enterprise. The Court recognized that states could tax the fair share of an interstate transportation enterprise which is permanently or habitually employed in the state, "including a portion of the intangible, or 'going-concern,' value of the enterprise." 390 U.S. at 323-34. *Norfolk* recognized that the process of valuing the going-concern value is "an elusive concept not susceptible of exact measurement." 390 U.S. at 324.

"As a consequence, the States have been permitted considerable latitude in devising formulas to measure the value of tangible property located within their borders. [Citation omitted.] Such formulas usually involve a determination of the percentage of the taxpayer's tangible assets situated in the taxing State and the

application of this percentage to a figure representing the total going-concern value of the enterprise." 390 U.S. at 324.

CIG's basis for the constitutional argument is that BOTA's adoption of the original cost method overstated the fair market value of CIG's Kansas properties by 200%. However, this conclusion assumes that CIG's valuations are correct and that BOTA's conclusions actually overstated CIG's value. Our conclusions above suggest substantial evidence supports BOTA's decision. Further, the record contains evidence that allocation by original cost is a reasonable allocation method reflecting the fair market value of CIG's properties in Kansas. Under these circumstances, we are unable to conclude that CIG's constitutional rights were violated.

## IV. INTANGIBLE PROPERTY

CIG argued that BOTA erred by including capitalized interest and overhead expenses in the value of CIG's unit.

This issue is controlled by the Kansas Constitution which states that property is divided into two classes for taxation purposes: Class 1 consists of real property and Class 2 consists of tangible personal property. Kan. Const. art. 11, § 1. Class 2 is further divided into six subsections. This court is faced in this case with the third subsection, which includes "[p]ublic utility tangible personal property." Kan. Const. art. 11, § 1.

The Kansas Constitution does not mention intangibles, thus raising the issue of the constitutionality of taxing intangibles. See *In re Tax Appeal of Western Resources, Inc.*, 22 Kan. App. 2d 593, 598-99, 919 P.2d 1048 (1996). In *In re Tax Protest of Strayer*, 239 Kan. 136, 143, 716 P.2d 588 (1986), this court held that an intangible which constitutes an essential portion of a tangible asset, without which the tangible asset could not function, is taxable as tangible property. The Court of Appeals in *Western Resources* held that intangible property "may be used to the extent that it creates an 'enhanced' value of tangible property." 22 Kan. App. 2d at 602.

BOTA found that the interest and overhead are tangible assets that are appropriately included in CIG's unit value. In support, BOTA relied upon James Ifflander's testimony. Ifflander, an expert called by PVD, testified regarding a four-part test for defining in-

tangibles: (1) The asset must be legally definable, (2) the asset must be capable of private ownership, (3) the asset must be separate and divisible from the tangible asset and marketable by itself, and (4) the asset must have value. Ifflander explained excludable intangibles would include patents, copyrights, or other legally definable intangibles. Ifflander noted that other items merely influence the unit value and cannot be separated from the property. Relying on Ifflander's testimony, BOTA concluded CIG failed to identify intangible assets that have been included in CIG's unit value.

CIG identified interest and overhead as intangibles that should have been excluded from CIG's unit value. CIG reasons that FERC required CIG to capitalize the expenses of interest and overhead in determining the rate base and, therefore, these accounts are intangible assets. The interest and overhead fail to meet any of the tests described by Ifflander. CIG argued that BOTA erred by including certain property in its unit valuation, yet identified no property which could be severed from the unit. Given BOTA's status as a specialized agency acting within its area of expertise, we affirm BOTA's decision.

## V. THE 1992 AMENDMENT OF ART. 11, § 1 OF THE KANSAS CONSTITUTION

CIG argued that the 1992 amendment to Kansas Constitution, art. 11, § 1, violated the Equal Protection Clause of the United States Constitution.

The interpretation of our constitution is a question of law subject to unlimited review. *Board of Leavenworth County Comm'rs v. McGraw Fertilizer Serv., Inc.*, 261 Kan. 901, 919, 933 P.3d 698 (1997). In reviewing the constitutionality of our state constitution, we deal with familiar rules of construction. The constitutionality is presumed, and all doubts must be resolved in favor of its validity. Before the Kansas Constitution can be struck down as violating the federal Constitution, the infringement must be clear beyond substantial doubt. *Van Sickle v. Shanahan*, 212 Kan. 426 Syl. ¶ 1, 511 P.2d 223 (1973).

Beginning in 1989, Kansas Constitution art. 11, § 1(b)(2) exempted "merchant's and manufacturer's inventories" from prop-

erty taxation. L. 1985, ch. 364, sec. 1. In 1990, this court in *Colorado Interstate Gas Co. v. Board of Morton County Comm'rs*, 247 Kan. 654, 663, 802 P.2d 584 (1990), reversed BOTA's determination that the natural gas pipeline companies could not benefit from the inventory exemption. The 1992 constitutional amendment specifically made the inventories of public utilities' tangible personal property subject to taxation. The exemption for merchants' and manufacturers' inventories was made subject to the specific language which applied to the public utilities. L. 1992, ch. 342, sec. 1.

Under the Equal Protection Clause, "[t]he appropriate standard of review is whether the difference in treatment . . . rationally furthers a legitimate state interest." *Nordlinger v. Hahn*, 505 U.S. 1, 11, 120 L. Ed. 2d 1, 112 S. Ct. 2326 (1992). The Equal Protection Clause is satisfied as long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decision maker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational. The standard is especially deferential in the context of classifications made by complex tax laws.

The only rationale offered by the PVD for the 1992 amendment is that the amendment was designed to reinstate the tax law as it was intended before this court's decision in 1992, which held that the natural gas pipeline companies could exempt their inventories from property taxation under the constitution. In support, the PVD cites a reference in the 1990 court opinion to the fact that legislators had submitted affidavits indicating that the addition of the "merchant's and manufacturer's inventories" language in 1985 was not intended to apply to the inventories owned by public utilities. *Colorado Interstate Gas Co.*, 247 Kan. at 662 ("Various legislators filed affidavits in the BOTA proceedings herein to the effect that the proposed amendment was not intended to alter the assessment and taxation of inventories owned by public utilities."); L. 1985, ch. 364, sec. 1. Nevertheless, a difference of treatment exists, and we must determine whether Kansas has a rational basis for that difference.

In a footnote, there is a hint at the PVD's reasoning. The PVD reasons that CIG is treated as are all other natural gas pipeline companies; therefore, there is not an equal protection violation. The PVD said natural gas pipeline companies are similarly situated. This ignores the question of whether all merchants in Kansas are similarly situated. This court's 1990 decision suggests that natural gas pipeline companies are "merchants." Clearly, they are a special kind of merchant, and this distinction may suggest a rational basis that furthers a legitimate state interest, but the PVD has offered no such rational basis in this case.

We find particular guidance in *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 156 L. Ed. 2d 97, 123 S. Ct. 2156 (2003), a recent case which reviewed the decision by the Supreme Court of Iowa striking down an Iowa statute that differentiated between revenues from slot machines on riverboats and revenues from slot machines at racetracks. The Iowa statutes taxed the revenues from riverboats at 20% but taxed the revenues from racetracks at 36%. The racetracks brought an action challenging the differential, asserting violation of equal protection rights, and the Iowa Supreme Court struck down the statute. In its analysis, the Court relied upon the rational basis test in *Nordlinger*. *Fitzgerald* concluded that the Iowa Legislature, by wanting to aid riverboats, which were facing financial trouble, had a rational basis for the tax rate differential. 539 U.S. at 109.

Our review of the legislative history of the 1992 amendment to the Kansas Constitution revealed that the legislature and the citizens of Kansas had a rational basis for excepting public utilities' inventories from the merchants' and manufacturers' inventory exemption. The minutes before the House Committee on Taxation (February 6-15, 2001) reveal that some merchants and manufacturers were concerned the legislature would repeal the inventory exemption despite their testimonies that the taxation of inventories had strained the competitiveness of Kansas manufacturers for years such that the Kansas business had been falling behind in the national marketplace. Testimony suggested that the taxation of inventories was particularly harmful to manufacturers because the tax disadvantages of carrying larger inventories could overshadow

an otherwise good business practice. Other testimony suggested that (1) there was noncompliance with listing requirements, (2) the inventory taxes were highest when businesses could least afford to pay, and (3) some expensive items do not sell within a year's time and therefore are taxed multiple times. The natural gas pipeline corporations did not make the case that they faced the same economic difficulties that the legislature sought to lessen with the 1992 amendment. The legislature aimed to help a sector of the economy that was suffering. Thus, we conclude the 1992 legislature continued the inventory exemption for nonutility merchants and manufacturers out of concern for their economic viability.

The legislature had a plausible policy reason to distinguish between manufacturers and public utilities. The regulated business environment faced by the public utilities is very different from those faced by other manufacturers in the relatively unregulated sector. Under the facts of this case, it was rational for the legislature and the people of Kansas to craft a taxation scheme that is beneficial to one group yet deny the same benefits to another, based upon the fact that the groups are not similarly situated.

Affirmed.

ABBOTT, J.; not participating.

BRAZIL, S.J., assigned